**William F. MARTIN, et al., Plaintiffs,**

v.

**KELDORN, INC., Defendant.**

No. 77 C 3422.

United States District Court,
N. D. Illinois, E. D.

Findings of Fact and Conclusions
of Law Aug. 19, 1982.

Amended Judgment Order Sept. 1, 1982.

Bernard M. Baum, Walter J. Reum, Chicago, Ill., for plaintiffs.

James Lanting, South Holland, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PERRY, Senior District Judge.

This cause came on for trial without a jury. The court has now heard all of the evidence, has viewed and read all of the exhibits admitted as evidence, heard all of the arguments by the attorneys for the plaintiffs, and is now fully advised in the premises herein. The court hereby makes its findings of fact and its conclusions of law as set forth hereunder.

## FINDINGS OF FACT

1. The Plaintiffs are the Trustees of various multi-employer fringe benefit funds established pursuant to collective bargaining agreements for the purpose of providing pension, health and welfare, apprenticeship, and vacation benefits for employee-beneficiaries who are employed as heavy equipment operators. The Plaintiff Trustees administer their respective trusts in accordance with the provisions of the respective Agreements and Declarations of Trust, and in accordance with the provisions of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 186, and the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001, et seq.

2. Under the terms of the Agreements and Declarations of Trust, the Trustees are required to receive contributions from contractually obligated employers, and to hold and manage those contributions for the exclusive purpose of providing benefits to the employee-beneficiaries, pursuant to law and the applicable written Agreements.

3. The Defendant, KELDORN, INC., is an employer in an industry affecting commerce, which employs and has employed certain individuals in an appropriate unit of heavy equipment operators, a majority of whom are members of and represented by Local 150 of the International Union of Operating Engineers, AFL–CIO. The Defendant does business within the geographical jurisdiction of the Court.

4. On March 16, 1965, Kel-Dorn Excavators, a partnership, executed a written Memorandum of Agreement with Local 150 of the International Union of Operating Engineers. Pursuant to this Agreement, Kel-Dorn Excavators recognized Local 150 as the sole and exclusive bargaining agent for those of its employees who operated heavy equipment. Kel-Dorn Excavators further agreed to be bound by the terms

and conditions of the various Agreements and Declarations of Trust, pursuant to which Plaintiffs hold their Trusts, and to the Heavy and Highway and Underground collective bargaining agreement then in effect between Local 150 and various employers. Kel-Dorn Excavators also agreed that its obligations under the Trust Agreements and the collective bargaining agreement would extend to amended versions of the Trust Agreements, and to all subsequently negotiated collective bargaining agreements until such time as the Company affirmatively terminated its obligations in the manner provided in the Memorandum of Agreement.

5. Defendant, KELDORN, INC., is the successor to Kel-Dorn Excavators, and has succeeded to the obligations of Kel-Dorn Excavators set forth in the preceding paragraph. The Defendant has admitted that the Memorandum of Agreement establishes its obligations to the Plaintiffs pursuant to the terms of the Trust Agreements, the collective bargaining agreements, and in particular, the Heavy and Highway and Underground collective bargaining agreements in effect between 1973 and 1978.

6. Among the Defendant's obligations to the Plaintiffs is the obligation that the Defendant submit to the Plaintiffs every month a written report setting forth the actual number of hours in that month which each of its bargaining unit employees worked and were paid. The Defendant is further required to submit monetary fringe benefit contributions to the Plaintiffs at rates specified in the collective bargaining agreements for each hour which its bargaining unit employees worked and were paid. Nothing in the Trust Agreements or collective bargaining agreements permits the Defendant to report or pay contributions based upon anything other than the actual hours worked by and paid to its employees.

7. On the basis of contributions received from employers, the Plaintiffs grant fringe benefit eligibility to eligible employees based upon the terms of the respective Plans.

8. Because of the fact that eligibility for fringe benefits depends upon actual hours worked and paid, the Trust Agreements provide that the Plaintiffs are entitled to audit the records of participating employers to determine whether or not they have accurately reported the actual hours worked by and paid to their employees. The Trust Agreements further provide that in the event an audit reveals an employer to have underreported and underpaid contributions to the Funds, the Trustees are entitled to recover from said employer all costs of auditing the employer's records, liquidated damages in the amount of 10 percent of all delinquent contributions, and the Trustees' reasonable attorneys' fees.

9. In 1977, the Plaintiffs requested that the Defendant permit an audit of its records. The Defendant refused, and Plaintiffs brought this action.

10. During the pendency of this litigation and on the basis of certain discovery requests filed by the Plaintiffs, Plaintiffs obtained access to the Defendant's records and an audit was performed on December 12, 1978, by the certified public accounting firm of Schultz & Chez.

11. The audit revealed that between 1975 and 1977, the Defendant had seven employees who were or may have been operating engineers. These employees were Fred Doorn, Ed Doorn, Jack DeVries, D. Drinnan, Ed Peters, Gary Hofstra and John Mark. Ed Doorn and Fred Doorn were indicated as being officers in the defendant corporation. Five of the seven employees had previously been reported to the Plaintiffs as being operating engineers. The remaining two, Hofstra and Mark, had never been reported to the Plaintiffs, but based upon the rate of pay which they were receiving, and the absence of additional information as to their duties, the auditor provided a list of their hours, subject to review by the Fund Administrator. As a consequence, the completed audit report detailed the number of hours for each month during the audited period which each employee worked for the Defendant and was paid.

12. The audit report further compared the actual hours worked and paid by the Defendant's employees to the hours which the Defendant had reported to the Plaintiffs. A clear pattern emerged which showed that the Defendant had not only failed to report actual hours worked by and paid to its employees, but had been reporting hours on a purely arbitrary basis. From January, 1975 through April, 1976, the Defendant reported an arbitrary number of hours for each employee. That identical arbitrary number was reported on behalf of each and every one of the employees reported in that particular month. The audit reveals that in every case, this arbitrary number, supposedly representing hours worked and paid, was inaccurate. From May, 1976 through December, 1977, the Defendant changed its procedure and simply reported on the basis of a straight 40 hours a week or 160 hours a month. In every case, this too was inaccurate. The audit therefore, revealed that at no time between January, 1975 and December, 1977, did the Defendant report actual hours worked by its employees.

13. As a consequence of this consistently inaccurate reporting by the Defendant, the audit revealed that in the case of some employees for some months, the Defendant had underreported and underpaid contributions to the Plaintiffs. In other cases and other months, the Defendant had overreported and overpaid contributions to the Plaintiffs.

14. On the basis of the hours reported by the Defendant in its contribution reports, all of the Defendant's employees qualified for fringe benefit eligibility, and received such eligibility from Plaintiffs. But had the Defendant reported actual hours worked and paid, some of the men would not have been eligible for some time periods when eligibility had been extended to them.

15. At all relevant times the Defendant's officers were aware that the hours reported and paid by the Defendant to the Plaintiffs were not the actual hours worked by the Defendant's employees and for which they were paid.

16. As a consequence, the Defendant's reporting was not based upon any mistake, but was intentionally inaccurate. The Defendant reported inaccurately in order to obtain fringe benefit eligibility and coverage for its employees even though those employees would have been ineligible during some of the periods in question. The Defendant also reported inaccurately because it was simpler to do so, even though by so doing, the Defendant was violating its Collective Bargaining Agreement.

17. When the Plaintiffs' auditors complete an audit of an employer's records, they submit a report to the Plaintiffs. The usual procedure is for that audit to be reviewed by the Plaintiffs' authorized representative, the Plan Administrator. The Administrator has at his disposal the resources and information necessary to investigate the eligibility of given employees, or lack thereof, and the authority to obtain advice from legal counsel regarding questions of law raised by the audits. Based upon the Administrator's review, and consultation with counsel where necessary, the Administrator will make revisions or adjustments on the face of the audit worksheets where required by the facts or law. Where such revisions are necessary, they are at all times based upon the auditor's report of actual hours worked by and paid to the employees in question and, as a consequence, it is that item of information which is the principal objective of the audits. However, final determination of the proper amounts due the Funds often depends upon the answers to questions of fact and law. That determination is the exclusive responsibility of the Administrator.

18. Among the aspects of a completed audit report which receive the most careful review by the Fund Administrator, are indications that the employer has overreported and overpaid contributions to the Funds. Upon enactment of the Employee Retirement Income Security Act of 1974, the Plaintiffs sought the advice of counsel regarding the effect of a provision contained therein as Section 403(c)(2)(A), 29 U.S.C.

§ 1103(c)(2)(A), prohibiting the return of contributions made. Based upon that statutory provision, counsel advised the Plaintiffs' Administrator that a return of contributions was permitted by law only under certain narrowly defined circumstances, and that when an audit report revealed overpayments to the Funds, allowing "credits" for those overpayments against other amounts due could be a violation of that provision. Counsel provided the Administrator with detailed instructions and guidelines for reviewing audits to determine whether "credits" could be allowed. As a consequence, no audit report submitted by the Trustees' auditor can be a final determination of an employer's liability to the Funds until overpayments revealed by that audit are reviewed by the Administrator.

19. Upon his review of the audit of the Defendant's records, the Administrator determined that the vast majority of overpayments made by the Defendant to the Plaintiffs could not be credited against other contributions due because of Section 403(c)(2)(A) of ERISA. The Administrator determined that the overpayments were made intentionally and not by mistake, and in any event, had been made more than a year previously, so that a return of those contributions was absolutely prohibited by ERISA Section 403(c)(2)(A). Further, the Administrator determined that fringe benefit eligibility had already been extended to the employees based upon the hours reported, in certain cases would not have been extended had actual hours been reported by Defendant, and as a consequence, return of the contributions to Defendant, through allowance of credits, would work to the detriment of the actuarial integrity of the Funds. In addition, the contributions made to the Vacation Fund had already been paid to the employees so there was nothing against which to "credit" overpayments. Based upon all of these considerations, the audit was revised by the Administrator by adding back into the totals found due by the auditors, those amounts which the auditors subtracted because they were found by the auditors to have been overpaid.

20. The Administrator also preliminarily determined that John Mark and Gary Hofstra should have been included in the audit as bargaining unit employees, but Ed Doorn and Fred Doorn, as non-bargaining unit employees, should not. Based upon all of these revisions, and based upon the actual hours found by the auditors to have been worked by and paid to the various employees, the calculation of the amounts due the Funds was revised, and a bill was sent to the Defendant. That original bill, dated March 26, 1979, demanded immediate payment of the sum of $15,111.75, which included liquidated damages and audit costs.

21. In September, 1979, the Administrator determined that Ed Doorn and Fred Doorn should be given the opportunity to establish their eligibility for fringe benefit coverage. The Administrator sent letters to both men requesting information as to whether or not they were eligible employees. Subsequently, the Administrator, upon receipt of additional evidence, was satisfied that both men were eligible bargaining unit employees, and the audit was revised to reflect this change. Based upon this revision, the revised audit showed a total of $16,593.59 due from the Defendant, including liquidated damages and audit costs.

22. By subsequent stipulation, and on the basis of certain affidavits submitted by the Defendant, the Funds' records were revised once again. The parties stipulated that Gary Hofstra and John Mark were not, in fact, eligible bargaining unit employees. As a consequence, the amounts which had been found due on their behalf were removed from the audit, and the audit was revised again to show a total of $8,955.85 due from the Defendant. This total represents $7,505.32 in delinquent contributions, liquidated damages in the amount of $750.53, and the audit charge of $700.00.

23. The Defendant has admitted to owing the Plaintiffs $2,587.97 in delinquent contributions, which sum does not include any liquidated damages or audit charge.

24. The Plaintiffs' calculations and the Defendant's calculations are identical and based upon identical information with only

one exception. The only difference between the two sets of figures is that the Defendant has subtracted all sums which the audit revealed to have been overpaid to the Plaintiffs, whereas the Plaintiffs have not subtracted most of those sums based on the provisions of Section 403(c)(2)(A) of ERISA. Rather than subtracting those overpayments, the Plaintiffs have disallowed a return of those overpayments and removed them entirely from the calculations. Thus, the Defendant's calculations include full offset for all overpayments which the Defendant made, while the Plaintiffs' calculations include only a partial offset. Thus, the sole issue in this case is whether the Defendant is entitled to a full offset or a partial offset.

25. The money which the Defendant has overpaid to the Plaintiffs has become a part of the Trusts' assets and remain assets of the Trusts.

26. Because of the nature of the benefits provided by the Plaintiffs and the fact that benefit eligibility is based upon meeting the requirements of specified numbers of hours in specified periods of time paid at specified contribution rates, overpayments made on behalf of a given employee in a given period at a given rate cannot be offset against underpayments on behalf of a different employee at a different time at a different rate without permitting the employer to reap a windfall at the Trusts' expense. The nature of this windfall would be the obtaining by the employer of fringe benefit eligibility for its employees without paying the full amount due the Trusts for providing that eligibility.

27. The full offset sought by the Defendant would have the consequence of reaping such a windfall for the Defendant. The partial offset for the months of November and December, 1977, permitted by the Plaintiffs would prevent the Defendant from reaping such a windfall.

28. As a consequence, the full offset sought by the Defendant constitutes a return of contributions made, and would result in Trust assets inuring to the benefit of an employer.

29. Such a return of contributions would work a serious harm to the Trusts, would result in the Trusts having extended benefit coverage without receiving full payment therefor, and would injure the actuarial integrity of the Trusts.

30. In addition to the fringe benefit eligibility extended by the Plaintiffs to the Defendant's employees and paid for by the Plaintiffs out of Trust assets, the Trustees of the Midwest Operating Engineers Welfare Fund have also incurred costs for benefits paid to or on behalf of the Defendant's employees, over and above the cost to the Trust of extending coverage. Based upon hours reported by the Defendant to the Plaintiffs the Trustees of the said Welfare Fund have paid claims in excess of $2,700.00 to or on behalf of the Defendant's employees based upon hours which the Defendant intentionally misreported to the Plaintiffs.

31. As a consequence, returning contributions overpaid by the Defendant means that the Welfare Fund would be required to pay twice. The Welfare Fund would have paid substantial sums of claims to the Defendant's employees, and then would be required to return the very contributions which made those employees eligible.

32. The Trustees of the Vacation Savings Plan are physically unable to return contributions overpaid without depriving all other beneficiaries of that Fund of benefits to which they are entitled. Vacation contributions are invested by the Trustees and paid to the employees along with a share of the accumulated earnings of the Trust on an annual basis. All vacation contributions made by the Defendant between 1975 and 1977 were already paid out to the Defendant's employees before the audit was even conducted. As a consequence, the Vacation Fund cannot return contributions now without taking those contributions from the fund which it holds for current payout to current employee-beneficiaries.

33. The Defendant has received in all respects exactly what it paid for, fringe

benefit eligibility and coverage for its employees. It has not, however, paid the full amount which was required by it to obtain that coverage.

34. After the enactment of the Multi-Employer Pension Plan Amendment Act of 1980, the Administrator reviewed the prior determinations, and concluded that no changes were necessitated by the new Act.

35. The total amount of contributions owed by the Defendant to the Plaintiffs is $7,505.32. The total amount of liquidated damages due the Plaintiffs is $750.53. The costs incurred by the Plaintiffs in auditing the Defendant's records total $700.00.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this action pursuant to the provisions of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 185(a).

2. The Defendant, KELDORN, INC., is in violation of its contractual obligations to the Plaintiffs by virtue of its intentionally inaccurate reporting during the years of 1975 through 1977, and its consequent failure to pay all fringe benefit contributions required by it to have been paid.

3. The Defendant is liable to the Plaintiffs for all fringe benefit contributions revealed by the audit to be delinquent in the total amount of $7,505.32, plus liquidated damages in the amount of 10 percent of those delinquent contributions, plus all costs of audit and the Plaintiffs' reasonable attorneys' fees.

4. Section 403(c) of ERISA prohibits the Plaintiffs from returning fringe benefit contributions made in the absence of a statutory exception. The only relevant exception in effect at the time of the instant audit, was that for overpayments made based upon mistake of fact and within one year.

5. Section 403(c)(2)(A) of ERISA prohibits the Plaintiffs from offsetting overpayments against underpayments unless the overpayments were made by mistake of fact within one year.

6. That the aforesaid provision was amended by the Multi-Employer Pension Plan Amendment Act of 1980 to permit, but not require, offset of overpayments against underpayments which occur by reason of a mistake of law or a mistake of fact within six months after the plan administrator determines the contribution was made by a mistake.

7. The overpayments made to the Plaintiffs by the Defendant during the period January, 1975 through December, 1977 were intentional and not made by mistake.

8. The overpayments made to the Plaintiffs by the Defendant, with the exception of those for November and December, 1977, were made more than one year prior to the audit.

9. Plaintiffs are not required under either the 1974 version or the 1980 version of § 403cc to grant the Defendant a full offset of contributions overpaid and the law requires the Court to enter judgment in Plaintiffs' favor for all delinquent contributions without further offset as contended by Defendant.

10. Judgment should be entered in favor of the Plaintiffs and against Defendant in the amount of $7,505.32, representing delinquent contributions, plus $750.53 in liquidated damages, plus $700.00 representing the cost to Plaintiffs of auditing the Defendant's records, plus Plaintiffs' reasonable attorneys' fees as shall be determined in subsequent proceedings.